UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| CHARLES E. ZELLERS, SR., | ) | |
| Plaintiff, | ) | Civil Action No. 7:21-cv-393 |
| | ) | |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| RALPH S. NORTHAM, *et al.*, | ) | United States District Judge |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Charles E. Zellers, Sr., an inmate in the custody of the Virginia Department of
Corrections (VDOC), proceeding *pro se,* commenced this civil action under 42 U.S.C. § 1983.
The court previously *sua sponte* dismissed some of Zellers's claims and some of the defendants,
but it allowed the case to go forward as to certain claims against four defendants: former Virginia
Governor Ralph S. Northam, VDOC Director Harold W. Clarke, Buckingham Correctional
Center (BKCC) Warden John A. Woodson, and Correctional Officer L. Woodson.[1]  In general
terms, there are two groups of claims.  The first group alleges that defendants' policies at the
beginning of the COVID-19 pandemic—which Zellers says included unsanitary conditions,
failure to conduct proper contact tracing and provide personal protective equipment (PPE), and a
failure to sufficiently reduce the prison population—exhibited deliberate indifference to Zellers's
Eighth Amendment rights.  The second group stems from his claims that once he began
experiencing symptoms of COVID-19, he was not given prompt medical attention and was
forced to walk to the medical department despite breathing difficulties.  He asserts that L.
Woodson failed to promptly obtain medical care for him when he reported his symptoms, and he
also faults chronic understaffing at BKCC and defendants' failure to have a policy requiring that

---

[1] References in this opinion to "Woodson" without any initial are to Warden Woodson.  When the court is
referring to the Correctional Officer, it will include her first initial and use "L. Woodson."

suspected COVID-19 patients be transported by wheelchair or stretcher to the medical department.  (*See also* Mem Op. 4–5, Dkt. No. 70 (describing claims that remain in case).)

Pending before the court are two motions to dismiss, both of which are fully briefed and ripe for disposition.  In them, defendants seek dismissal of all claims against them on several grounds.  The first motion was filed by defendants Northam, Clarke, and Woodson.  The second was filed by L. Woodson.

In the first motion brought by Northam, Clarke, and Woodson, defendants have attached exhibits and also have asked the court to take judicial notice of certain documents.  District courts have discretion "to determine whether or not to 'exclude' matters outside the pleadings."  *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp.*, 109 F.3d 993, 996 (4th Cir. 1997).[2]  Usually, when "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d); *Zak v. v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015). Because the court has considered and not excluded materials submitted by the parties in ruling on the first motion to dismiss, the court will treat that motion as one for summary judgment, as it warned it might do.  (*See* Notice, Dkt. No. 79 (advising that "if documents or affidavits outside the pleadings are submitted by either party, any remaining motion(s) to dismiss under Rule 12(b)(6) . . . may be considered as motion(s) for summary judgment under Rule 56").)

As for L. Woodson's motion, neither she nor Zellers has presented any additional materials.  Thus, the court will consider it under Rule 12(b)(6).

For the reasons set forth herein, defendants' motion for summary judgment and motion to dismiss will be granted, and all remaining motions will be denied as moot.

---

[2]  The court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted.  *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

## I.  BACKGROUND

### A.  Specific Allegations of the Second Amended Complaint

According to the second amended complaint, the operative complaint, Zellers is a VDOC inmate who was housed at BKCC during the relevant time.  Zellers has been incarcerated since January 25, 1993, and has been eligible for release on discretionary parole since July 30, 2005. (2nd Am. Compl. ¶¶ 5, 17, 20, Dkt. No. 58.)

Zellers describes Northam as being "legally responsible for all government agencies and departments within the Commonwealth," Clarke as "legally responsible for the overall operation of" VDOC and its prisons, and Woodson as "legally responsible for the operations of the prison and for the welfare of its prisoners and staff."  (*Id.* ¶¶ 6–8.)

Zellers has underlying medical conditions that place him at a greater risk of complications from contracting COVID-19.  (*Id.* ¶ 16.)  In 2020, Zellers contracted the COVID-19 virus while incarcerated at BKCC, and he was subsequently hospitalized.  (*Id.* ¶ 5.)  He believes that he was exposed to COVID-19 when he went to the administration building on May 26, 2020, for a parole hearing "over the computer."  Although he was wearing a "VCE-made sneeze guard," he claims that he does not "remember seeing" any personal protective equipment or hand sanitizer within the administrative building.  He claims that he contracted COVID-19 from the officer who was monitoring the building's gatepost, although he does not explain how he knows this.  (*Id.* ¶¶ 26–31.)  However, he was not tested for COVID-19 between May 26, 2020, and June 3, 2020.

On Thursday, June 4, 2020, Zellers reported his "current medical conditions," including shortness of breath, to L. Woodson, a correctional officer, who "did not report [his] condition to her supervisor."  (*Id.* ¶ 37.)  L. Woodson told him that there was no one in the medical department at that time because they were out in the housing units distributing medication and

that he should go back to his cell until she told him he could walk to medical.  She told him later that morning that he could now go to the medical department, and he walked there.  He was then taken to the hospital.  (*Id.* ¶¶ 43–49.)

Zellers alleges that defendants Northam, Clarke, and Woodson "failed to embrace a policy or take other reasonable steps which may have prevented" him from contracting the virus, such as releasing him on parole.  (*Id.* ¶ 165.)  He further alleges that, among other failures, they failed to adequately reduce each prison's population, enforce social distancing, or provide him with proper personal protective equipment prior to his contracting COVID-19.  (*Id.* ¶¶ 168–170.)

## B. Additional Facts and Information Considered When Ruling on the Summary Judgment Motion

As exhibits to their motion, defendants Northam, Clarke, and Woodson have submitted three documents for the court's consideration, all of which relate to VDOC's COVID-19-response measures.  The documents are VDOC's sanitation plan in effect as of April 2020 (Dkt. No. 76-1); VDOC's first medical screening guidelines roughly corresponding to the date Zellers contacted COVID-19 (Dkt. No. 76-2); and a guidance system instituting temperature checks and "zones" to clarify appropriate use of PPE (Dkt. No. 76-3).  These materials are particularly helpful to the court's resolution of defendants' summary judgment motion because, although Zellers repeatedly states that defendants did not do enough to protect him from contracting COVID-19, he provides very little information about what they actually did.  Defendants also request that the court take judicial notice of the history of VDOC's response measures, which is set forth in some detail through press releases and other information publicly available on the VDOC website.  The attached documents and other information add the relevant facts set forth next to the summary judgment record.

On March 13, 2020, the President of the United States declared a national emergency concerning the COVID-19 pandemic.  That same day, VDOC suspended all inmate visitation at

VDOC facilities.  Community volunteers were also suspended effective March 16, 2020, and in-person attorney visitation was suspended as of March 17, 2020.  In the remainder of March, VDOC issued plans and guidance that included various provisions intended to limit the spread of COVID-19 and to treat persons who became ill.  These policies included the following:

- requirements for frequent sanitation of housing units and common areas;

- medical screening guidelines, which were updated at about the same time Zellers believes he contracted COVID-19;

- a suspension of all transfers between VDOC facilities, limitation on transfers of inmates between housing units, and suspension of nearly all jail intakes into VDOC facilities, excepting persons with serious medical or mental health needs;

- modified lock-downs of VDOC facilities, such that inmates were limited to interacting with other inmates from their assigned unit or dorm;

- cancellation of group activities, staff movement between buildings, non-essential inmate work assignments;

- a requirement that meals be brought to inmates in their housing units instead of having the inmate population move through dining areas;

- the provision of cloth face masks ("sneeze guards") to inmates, which were required to be worn outside of their assigned cells; and

- mandatory temperature checks for all incoming staff and contractors, and a zone system, established to clarify the appropriate use of PPE, depending on whether a particular area has no known or suspected positive cases, suspected cases, or confirmed positive cases. In certain zones, single cells were required and additional precautions also were required.

(*See* Mem. Supp. Mot. Dismiss 10–12 & Exs. A–C, E.)

Defendants also note that VDOC reached a settlement agreement in *Whorley v. Northam*, Case No. 3:20cv00255 (E.D. Va.) (*Whorley*), on May 11, 2020, almost a month before Zellers became ill.  (*See* Mem. Supp. Mot. Dismiss, Ex. E, Dkt. No. 76-5).  The *Whorley* litigation was brought by a number of VDOC inmates, by and through counsel, and alleged that conditions of confinement in VDOC facilities and a failure to enact and enforce adequate policies to prevent the spread of COVID-19, violated the plaintiffs' Eighth Amendment rights.  *See generally*

5

*Whorley*, Compl., ECF No. 1.  In the settlement agreement, the parties acknowledge that it is not an admission by the defendants of any liability, including any admission of any violation of any federal law.  *Whorley*, Settlement Agreement ¶ 10, ECF No. 12-1.  But the parties consented to continuing jurisdiction by the court over disputes concerning the agreement, and plaintiffs agreed to the dismissal of their case.  *See id* ¶¶ 1, 8.

  Pursuant to that settlement agreement, VDOC officials were required to file weekly reports with the court identifying the number of offenders reviewed for release, granted release, and denied release pursuant to the Early Release Plan, described in the next paragraph.  The settlement agreement also included provisions by which VDOC would: (1) waive co-pays for sick calls and medical assessments during the term of the Agreement; (2) test inmates and report numbers of inmates tested on a weekly basis; (3) continue giving inmates enhanced access to showers and handwashing, as well as cleaning materials; (4) continue "to require high interval sanitation of all equipment of common usage"; (5) continue to provide clean facemasks; (6) launder bed linens twice a week instead of once; (7) provide PPE and education about proper use of PPE to staff; (8) provide inmate education above COVID-19; and (9) continue to restrict inmate and staff movement "to the greatest extent possible."  *See generally id.*

Additionally, Governor Northam and the General Assembly passed a budget amendment on April 22, 2020, which gave VDOC the authority to release an inmate from incarceration prior to his scheduled release date, provided that the inmate had less than one year remaining on his sentence, and that the inmate had not been convicted of a class 1 felony or a sexually-violent offense.[3]  VDOC developed a policy to implement that provision (the Early Release Plan), which

---

[3] Zellers does not meet either requirement.  He is serving a life sentence, so he does not have less than one year remaining on his sentence.  *See* https://vadoc.virginia.gov/general-public/offender-locator/ (listing for Zellers, which states "Single Life Sentence" for the field "Release Date").  And although his court records are not electronically available because of their age, newspaper accounts describing his being denied parole in 2020 reflect that he was convicted of first-degree murder (a class 1 felony) and forcible sodomy (a sexually violent offense).  *See* https://southsidemessenger.com/zellers-denied-parole-for-murder-in-1993/.

went into effect two days later.  (Mem. Supp. Mot. Dismiss, Ex. D.)  According to a status report filed in the *Whorley* case on June 2, 2020—around the date Zellers went to the medical department and was sent to the hospital—VDOC had reviewed 582 inmates eligible for potential early release, and it had approved the early release of 475 of those inmates.  As of that same date, VDOC had engaged in extensive testing of inmates, having tested approximately 13,898 inmates for COVID-19.  *See Whorley*, ECF No. 16.

In his unsworn response to the summary judgment motion,[4] Zellers lists only a single fact that he expressly disputes, which is counsel's recitation of his past convictions.  (Opp'n to Mot. Dismiss (Opp'n) 29–30, Dkt. No. 86-1; *see also supra* note 3.)  But throughout his opposition, Zellers alleges that Northam, Clarke, and Woodson failed to: (1) reasonably reduce each prison's population; and (2) do adequate contact tracing from the time he believes he contracted the virus until he became ill.  He faults Woodson for failing to ensure that Zellers was provided prompt medical care and transportation to the medical department.  He also claims, in general terms, that Woodson did not implement adequate precautionary measures and did not "adhere to adequate mitigation measures."  (Opp'n 4.)

Zellers also points out various ways in which the VDOC policies and procedures provided by defendants were not followed at BKCC.  He first addresses defendants' Exhibit A,

---

The court also finds no merit in Zellers's accusation that defendants' counsel "tr[ied] to make him look bad" by disclosing his criminal convictions to the court or his suggestion that his convictions are irrelevant.  (Opp'n 29.)  While the precise facts of Zellers's convictions may be irrelevant, the fact that he was convicted of a Class 1 felony and a forcible sex offense are relevant to show why he was not eligible for release under the budget amendment and Early Release Plan.

[4]  Although his opposition is unsworn, and the court is not required to consider it as summary judgment evidence, the court sees no prejudice to defendants in doing so because they are entitled to summary judgment regardless.  Thus, the court will treat factual statements in Zellers's opposition, if based on personal knowledge, as evidence in support of his summary judgment motion.  The court notes, however, that Zellers's opposition, while lengthy, is repetitive and contains many statements that are conclusions rather than factual allegations.  Further, his opposition also references incidents that occurred while he was in the hospital and other events which are not part of this case.  (*See, e.g.*, Opp'n 24.)  The court discusses only relevant, specific factual allegations based on personal knowledge.

which is titled "Medical Epidemic/Pandemic Sanitation Plan," and contains twenty pages of specific instructions for the sanitation of various parts of each VDOC prison.  He lists several "violations" of that policy that occurred at BKCC.  For example, he notes that high contact areas in "Administration, Offices, and Support Areas" were required to be cleaned four times a day, but "to his knowledge" that was not done.  He further claims that the BKCC pods did not comply with the cleaning and sanitation schedule set forth in that document for housing areas, that chemical bottles were not provided to each cleaning inmate or for high-traffic common areas, and that the amounts of hand sanitizer and paper towels provided were inadequate for the number of inmates in a housing unit.  (Opp'n 6–7.)

Zellers turns next to defendants' Exhibit B, titled "Medical Guideline for the Prevention and Management of Coronavirus (COVID-19)," which is a fourteen-page document explaining quarantine procedures and other procedures designed to prevent the transmission of COVID-19.  (Dkt. No. 76-2.)  He claims that Woodson ("or his subordinate") violated that policy, as well.  For example, Zellers asserts that hygiene items and supplies were not properly stocked in the commissary, that offenders were given cloth masks, rather than surgical masks or KN95 masks, as set forth in the CDC Guidelines, that they did not maintain social distancing from staff and offenders, and they did not place inmates in a single cell until "a disposition is determined." (Opp'n 7–8.)

He also lists similar types of failure to follow the policies in defendants' Exhibit C, the April 10, 2020 Memorandum titled "COVID-19 Interim Guidance—Facility Template."  (Dkt. No. 76-3.)  These include, for example, a failure to provide him with a surgical mask until 2022, a failure to provide an "N95 or N100 mask," and a failure to fully abide by the housing restrictions, staff screening, limitations on offender movement, and other aspects of that memorandum.  (Opp'n 9-10.)

Zellers's opposition also emphasizes—as he has throughout the litigation—that "the crux of this action all starts with Defendants Northam and Clarke with their" Early Release Plan. (Opp'n 8.)  He faults Northam for "providing the criteria" for the plan, and believes that the criteria should have permitted the early release of inmates like him, who were "medically vulnerable," presumably even if they did not meet the other criteria.  He claims that "he should have been released," and if he had been, then he would not have been at BKCC to contract the virus.  (Opp'n 8, 10–11.)

## II.  DISCUSSION

### A.  Defendants Northam, Clarke, and Woodson's Motion for Summary Judgment

#### 1.  Legal standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party.  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).  In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48.  Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990).

### 2.  Zellers appears to assert both official-capacity and individual-capacity claims

As a preliminary matter, it is not entirely clear whether Zellers's claims against Northam, Clarke, and Woodson are more appropriately viewed as individual-capacity claims or official-capacity claims.  The difference has been explained by the Supreme Court as follows:

> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.
>
> On the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right.  More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a moving force behind the deprivation; thus, in an official-capacity suit the entity's policy or custom must have played a part in the violation of federal law.

*Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985).

The Fourth Circuit has indicated that a court must "examine the substance of the [plaintiff's] claims" to determine whether a state official is named in his individual or official capacity.  *Martin v. Wood*, 772 F.3d 192, 195–96 (emphasis in original).  To do so, the court looks at factors such as whether "the allegedly unlawful actions of the state officials [were] tied inextricably to their official duties," whether a judgment against the state officials would "be institutional and official in character, such that it would operate against the State," and whether the state officials acted "to further personal interests distinct from the State's interests," among other factors.  *Id.* at 196; *see also Biggs v. Meadow*, 66 F.3d 56, 61 (4th Cir. 1995) (explaining

that challenges to policies or customs, or claims that an official "acted in accordance with" a policy or custom, are often official-capacity suits).

Here, Zellers has alleged facts that appear to fit into both categories. For example, as to Northam, he alleges that the criteria Northam established for early release under the budget amendment exhibited deliberate indifference, by not including—as an independent category— medically vulnerable inmates. This is essentially a challenge to a policy, which appears to be an official-capacity claim. But he also alleges that Northam was informed about the conditions at BKCC, through letters from Zellers and others, and failed to take adequate steps to improve those conditions. That appears to be an individual-capacity claim, which requires personal involvement in violating Zellers's constitutional rights.

The court therefore will interpret Zellers's complaint as asserting *both* individual-capacity claims and official-capacity claims against Northam, Clarke, and Woodson, which is also how defendants construe the complaint.

### 3. Zellers's official-capacity claims for damages and injunctive relief in form of release

Defendants correctly note that no official-capacity claims for damages are available against any of the defendants, all of whom are state officials and entitled to Eleventh Amendment immunity from claims for damages. *Will v. Mich. Dep't of State Police*, 419 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983."). Accordingly, all official-capacity claims for damages must be dismissed.

Additionally, Zellers's request for injunctive relief in the form of release from prison is not cognizable in this civil rights action, as the court repeatedly has advised him. (*See, e.g.*, Nov. 5, 2021 Mem. Op. 9–11, Dkt. No. 70 (explaining that relief in the form of immediate release must generally be brought in a habeas reaction, not as part of a § 1983 claim and explaining why such relief is inappropriate in this case).) In his opposition, as he has done in other motions filed

with the court, Zellers engages in an exercise in semantics, explaining that he is not seeking release but a "transfer" to home confinement to reside with his mother.  (Opp'n 40.)  This argument is not persuasive, and the court already has rejected it.  (*See, e.g.*, Nov. 5, 2021 Mem. Op. 8 ("[Zellers] characterizes this relief several ways (as a release, as home confinement, as "enlargement" of custody), but the goal—to be housed at his mother's home—remains unchanged."); May 5, 2022 Mem. Op. 10, Dkt. No. 94 (characterizing Zellers's request for an "enlargement" of custody to confinement at his mother's home as a "matter of semantics," and denying his request for release from incarceration, or release to home confinement).)  Accordingly, that particular request for relief will be denied.

### 4. Claims for violations of the Eighth Amendment

Zellers's claims against these defendants allege a violation of his Eighth Amendment rights.[5]  The Eighth Amendment protects prisoners from cruel and unusual living conditions.  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  To plead such a claim requires facts showing that: (1) objectively, the deprivation was sufficiently serious, in that the challenged, official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  To satisfy the first element, the prisoner must show "significant physical or emotional harm, or a grave risk of such harm,"

---

[5]  In his opposition, Zellers claims that the fact that he was not eligible for release under the early release plan violated his equal protection rights.  (Opp'n 10, 11, Dkt. No. 86-1.)  His allegations, however, fail to state a violation of the Equal Protection Clause.  To succeed on an equal protection claim, a litigant "must first demonstrate that he has been treated differently from others with whom he is similarly situated."  *Veney v. Wyche,* 293 F.3d 726, 730 (4th Cir. 2002) (quoting *Morrison v. Garraghty,* 239 F.3d 648, 654 (4th Cir. 2001)).  Two groups of persons are "similarly situated" only if they "are similar in all aspects relevant to attaining the legitimate objectives" of the policy or legislation.  *Van Der Linde Housing, Inc. v. Rivanna Solid Waste Auth.*, 507 F.3d 290, 293 (4th Cir. 2007).  Zellers claims that he should have been released because of his medical vulnerabilities.  A prisoner's crime and remaining time on his sentence, however, are relevant aspects of any decision to allow early release.  And Zellers has not identified any person with similar medical vulnerabilities who also had been convicted of a class 1 felony and/or sexually violent offense and was nonetheless released.  Indeed, VDOC did not have authority to release such persons, including him, under the budget amendment.  Thus, any claim based on the Equal Protection Clause fails.

resulting from the challenged conditions.  *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

    To show deliberate indifference, the plaintiff must show that the prison official actually knew of and disregarded the serious risk of harm posed by the conditions.  That standard is the equivalent of "subjective recklessness as used in the criminal law."  *Farmer*, 511 U.S. at 839.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  *Id.* at 844.

    Courts have recognized that the risk of exposure to a serious infectious disease can satisfy the first element of an Eighth Amendment conditions claim.  *See Hutto v. Finney*, 427 U.S. 678 (1978); *Helling v. McKinney*, 509 U.S. 25, 35 (1993).  And courts, including this one, have concluded that the potential spread of COVID-19 satisfies the objective element of an Eighth Amendment claim.  *Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (concluding, at least before vaccines were available, that the objective prong was "easily satisfied" by the transmissibility of the COVID-19 virus and seriousness of its symptoms, in conjunction with other factors); *Ross v.  Russell*, No. 7:20-cv-00774, 2022 WL 767093, at *10–11 (W.D. Va. Mar. 14, 2022).  Additionally, Zellers has stated that he suffers from conditions, including hypertension and morbid obesity, that put him at a higher risk to develop serious COVID-19 complications.  *See, e.g.*, *United States v. Brown*, No. 20-7095, 2021 WL 4461607, at *2 & n.3 (4th Cir. Sept. 29, 2021) (recognizing CDC guidance as to high blood pressure); *United States v. Johnson*, 858 F. App'x 682, 683 (4th Cir. 2021) (same as to obesity).[6]

    Based on the foregoing, the court concludes that the existence of COVID-19 within

---

    [6] As of June 2020, the CDC listed obesity as a condition that increases a risk of severe COVID-19 illness and listed "high blood pressure" as one that "might" increase a person's risk.  Centers for Disease Control and Prevention, "CDC updates, expands list of people at risk of severe COVID-19 illness" (June 25, 2020), available at https://www.cdc.gov/media/releases/2020/p0625-update-expands-covid-19.html (last visited August 23, 2022).  Zellers also lists "arthritis" as increasing his risk, but the CDC's June 2020 press release does not include arthritis.

BKCC satisfies the objective component of an Eighth Amendment conditions-of-confinement claim. The court concludes, however, that Zellers has not pled sufficient facts to show that any of the defendants were deliberately indifferent toward the risk COVID-19 posed, either to him personally or toward inmates at BKCC generally.

As discussed herein, this is true as to both his individual-capacity and official-capacity claims. As noted, to succeed on the individual-capacity claims, Zellers must show that each official personally violated his Eighth Amendment rights by being deliberately indifferent. *Kentucky*, 473 U.S. at 166. To succeed on the official-capacity claims, "[m]ore is required"— Zellers must show that "the entity's policy or custom must have played a part in the violation of federal law." *Id.*

a. *Defendant Northam*

Zellers's complaints against Northam are two-fold. His primary complaint seems to be that Northam devised the criteria for release under the budget amendment. Accepting that as true, it does not show deliberate indifference by Northam. To the contrary, his conduct in requesting the budget amendment and in implementing it quickly shows that he recognized the risks of COVID-19 transmission in a prison setting and took steps to reduce the capacity of prisons to protect inmates.

Zellers believes Northam should have done more, including making him eligible for release. But Northam did something, and what he did was reasonable. He and the legislators who approved the budget amendment had to balance the need to protect inmates by reducing their numbers with an obligation to protect society from dangerous persons and ensure that the sentences imposed on convicted persons were not significantly shortened. The court cannot find deliberate indifference based on Northam's failure to make more prisoners, especially ones with Zellers's criminal background, eligible for early release.

14

Zellers also suggests that Northam (apparently together with Clarke and Woodson), were responsible for creating what he says were inadequate COVID-prevention policies.  He attempts to impose personal liability by saying that Northam knew of conditions in the prisons, because of both press reports and letters from inmates, including Zellers, and that Northam and Clarke also were aware of problematic conditions as a result of the *Whorley* litigation.[7]  But even assuming defendants actually knew about Zellers's specific medical conditions or more generally knew of the conditions at BKCC,[8] he has not shown that the policies implemented throughout VDOC exhibited deliberate indifference toward his Eighth Amendment rights.  Nor has he shown that the failure to follow those policies perfectly constituted deliberate indifference.  The lack  of deliberate indifference by all three defendants is discussed in more detail in Section II-4-c, *infra*.

   b. *Defendant Woodson*

Zellers also makes several claims unique to Woodson, but he has not adequately alleged a constitutional violation as to these issues, either.  Zellers generally alleges that BKCC was overcrowded or understaffed, and he alleges that Woodson failed to ensure that there were always medical personnel in the medical department.  He has not alleged facts sufficient to show deliberate indifference by Woodson as to these issues, however.

Per Zellers's own allegations, there were medical personnel present that day at BKCC, but they were passing out medicines when he asked to go to the medical department.  Moreover,

---

[7] Although the existence of the *Whorley* case shows that defendants knew of complaints about certain of its facilities or its lack of policies generally, Northam and Clarke entered into a settlement agreement in that case, which required the many precautions listed above, and they did so *before* Zellers ever became ill.  Notably, the settlement agreement also allowed counsel for the plaintiffs to file a "Notice of Substantial Compliance" if counsel believed defendants were failing to substantially comply with the agreement.  The record in that case does not show that the court ever found that the defendants there failed to substantially comply with the requirements of the settlement agreement.  Interestingly, moreover, Zellers sent two letters to the assigned judge in the *Whorley* case, which the court referred to plaintiffs' counsel, requesting that counsel review and take any action counsel deemed appropriate.  *See Whorley*, ECF Nos. 62, 64, 65.  Nothing was filed by plaintiffs' counsel in response to those letters.

[8] There is scant evidence of any such knowledge, however.  For example, Zellers does not allege or show that either Northam or Clarke knew that the policies put in place were insufficient to protect inmates or that they were not being followed at BKCC.

personnel were back in the medical department at least by 8 a.m., when he was sent there.  Once he arrived, he was immediately given oxygen by a "long-time nurse" and sent to the hospital. (Opp'n 14.)  He provides no other specific information as to how BKCC had inadequate medical resources.  His limited allegations, without more, do not show that there was inadequate medical staffing at BKCC or that Woodson knew of any such problems.  Thus, he has failed to produce evidence from which a jury could find a constitutional violation.

Likewise, Zellers's assertion that BKCC should have had a policy requiring that all prisoners suspected of having COVID-19 be taken in a wheelchair to the medical department, rather than being asked to walk there, even if preferable, is not required by the Constitution.  The Constitution simply does not require that inmates be provided with immediate access to the precise medical care they seek at all times.  *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) ("[A] prisoner does not enjoy a constitutional right to the treatment of his or her choice."). It does not even ensure medical care free from negligence.  *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (noting that "negligence or malpractice in the provision of medical services does not constitute a claim under § 1983").  Instead, the Eighth Amendment requires only that officials not be deliberately indifferent toward a serious risk of substantial harm to any inmate. The fact that some ill inmates had to walk to the medical department does not reach that high threshold.

### c. *Defendants Northam, Clarke, and Woodson were not deliberately indifferent*

With regard to all of the conditions that Zellers says allowed him to contract COVID-19, his Eighth Amendment claims against Northam, Clarke, and Woodson all fail because he has not shown that any of the individual defendants knew of and disregarded an excessive risk to his health and safety, an "exacting" standard.  *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).  Nor has he shown, as to any official-capacity claims, that the policies themselves violated

his Eighth Amendment rights because they exhibited deliberate indifference.  In short, his allegations fail to show "subjective recklessness" on the part of the defendants or resulting from the policies.

Several circuit courts of appeal and a number of other district courts have all held that measures similar to VDOC's policies here, and even the occasional failure of the policies to be followed, did not rise to the level of an Eighth Amendment violation.  *Wilson v. Williams*, 961 F.3d 829, 841 (6th Cir. 2020) (concluding that similar policies and procedures were evidence that prison officials were not deliberately indifferent to the risk posed by COVID-19); *Swain v. Junior*, 961 F.3d 1276, 1287 (11th Cir. 2020) ("Neither the resultant harm of increasing infections nor the impossibility of achieving six-foot social distancing in a jail environment establishes that the defendants acted with 'subjective recklessness as used in the criminal law.'") (quoting *Farmer*, 511 U.S. at 839–40); *Grinis v. Spaulding*, 459 F. Supp. 3d 289, 292 (D. Mass. 2020) ("These affirmative steps may or may not be the best possible response to the threat of COVID-19 within the institution, but they undermine an argument that the respondents have been actionably deliberately indifferent to the health risks of inmates."); *Chunn v. Edge*, 465 F. Supp. 3d 168, 203 (E.D.N.Y. 2020) (a prison's measures to combat COVID-19 "indicate that prison officials are trying, very hard, to protect inmates against the virus and to treat those who have contracted it, and belie any suggestion that prison officials have turned the kind of blind eye and deaf ear to a known problem that would indicate deliberate indifference.")  *See also Simmermaker v. Trump*, No. 20-cv-01671-KMT, 2021 WL 915985, at *4 (D. Colo. Mar. 10, 2021) (the inability to maintain social distancing while using computer terminals or telephones or when interacting with their cellmates does not demonstrate defendants disregarded the risk of COVID-19).  Additionally, the fact that defendants' efforts were unsuccessful does not mean that they were unconstitutional.  *See Farmer*, 511 U.S. at 844; *Ryan v. Nagy*, No. 2:20-CV-11528,

2021 WL 6750962, at *9 (E.D. Mich. Oct. 25, 2021), *report and recommendation adopted in part,* No. 20-11528, 2022 WL 260812 (E.D. Mich. Jan. 26, 2022) ("The Eighth Amendment does not mandate perfect implementation. . . . Even if Defendant's measures were ultimately unsuccessful at stopping all coronavirus infection with the jail, they were reasonable and thus not unconstitutional.")

The Fifth Circuit's decision in *Valentine v. Collier*, 978 F.3d 154 (5th Cir. 2020), is instructive here, as well.  The *Valentine* court held that the district court erred in concluding that defendants were deliberately indifferent to the risk of COVID-19.  The appellate court pointed to the policies put in place by the defendants, which included suspension of in-person visitation, requirements for social distancing and masks, testing, education to inmates, increased access to soap and toilet paper, and isolation of positive inmates, and it concluded that they were sufficient to show that defendants were not deliberately indifferent.  This was true despite the fact that the district court had found the prison failed to enforce social distancing in the relevant unit, did not increase the janitorial staff's access to training or supplies, staff regularly violated the mask policy, surfaces were not cleaned regularly, no hand sanitizer was available, many sinks were broken, and the turnaround time for COVID-19 tests (at least at the beginning of the pandemic) was more than a week.  *Id.* at 164.  The Fifth Circuit reasoned that, in focusing on these deficiencies and on what more the prison could have done to stop the spread of the disease, the district court had held the prison "to a higher standard than the Constitution imposes. . . . The Eighth Amendment does not enact the CDC guidelines."  *Id.*  Acknowledging the "lapses" in the prison's response, the *Valentine* court explained that, as a matter of policy, the prison could have done more to protect vulnerable inmates, but that is not the Eighth Amendment standard.  *Id.* at 165.

As in *Valentine*, there was perhaps more defendants or their subordinates could have

18

done, and Zellers has alleged lapses similar to those identified in *Valentine*.  But Zellers has not alleged that the defendants turned a blind eye to the risk of COVID-19 or failed to act reasonably in response.  The evidence before the court—including the policies and documented extensive testing efforts—shows instead that the defendants' creation and at least partial implementation of comprehensive pandemic policies, were reasonable attempts to respond to the known risk of COVID-19 exposure.

Importantly, moreover, Zellers's own allegations (or his failures to dispute that portions of the policies were followed) confirm that defendants took steps to limit transmission of the disease among inmates.  This included lockdowns, some quarantining, and the provision of masks, even if not the kind he preferred or that the CDC said was ideal.  He also does not challenge that there was extensive testing of inmates and that there was some enhanced cleaning and sanitation, although not as much or as often as he would have liked.

It is possible that Northam, Clarke, and Woodson could have made different decisions or implemented different policies that may have been better at preventing the spread of COVID-19.  But even if there was more they could have done, the allegations here do not suggest that any of the defendants in charge of creating or implementing overall policies were deliberately indifferent as that term is defined in *Farmer*.  *See Baxley v. Jividen*, No. 3:18-1526, 2020 WL 1802935, at *6 (S.D. W. Va. Apr. 8, 2020) (noting, in context of denying preliminary injunction, that plaintiffs likely could not show deliberate indifference where defendants' actions showed that they had a plan in place to try to limit transmission of COVID-19).

Judges of this court, including this one, have dismissed similar claims brought by inmates alleging a failure to implement better policies to cope with COVID-19.  *See, e.g.*, *Ross*, 2022 WL 767093, at *13; *Anders v. Russell*, No. 7:21-cv-00030, 2022 WL 726923 (W.D. Va. Mar. 10, 2022).  In his opinion in *Anders*, Judge Jones also concluded that the plaintiff's "own allegations

about COVID-19 measures at WVRJ refute any claim of deliberate indifference." *Id.* at *5.  In doing so, Judge Jones also cited to *Baxley*.

As the *Baxley* court explained, "[t]he existence and ongoing implementation of Defendants' COVID-19 response plan makes it impossible to conclude that Defendants 'actually knew of and disregarded a substantial risk . . . .  In fact, the opposite seems to be the case: Defendants have demonstrated actual knowledge of the risk of COVID-19, and regard it with the seriousness it deserves." *Baxley*, 2020 WL 1802935, at *19–20 (S.D. W. Va. Apr. 8, 2020); *see also id.* ("Mitigation is all that can be demanded in this case, as no technology yet exists that can cure or entirely prevent COVID-19.  The best scientists in the world have been unable to eliminate the risk of the disease, and the Court can expect no more of Defendants."); *Tillery v. Va. Peninsula Reg'l Jail*, No. 1:20cv751, 2020 WL 6742991, at *5 (E.D. Va. Nov. 17, 2020) ("'*Every person in the United States, whether in a detention facility or not, faces COVID-19 exposure.*'") (quoting *Toure v. Hott*, 458 F. Supp. 3d 387, 408 (E.D. Va. 2020)).

For these reasons, all Eighth Amendment claims against Northam, Clarke, and Woodson will be dismissed.

> d.  *Qualified Immunity*

Because they have requested a ruling on qualified immunity (*see* Mem. Supp. Mot. to Dismiss 15–18), the court further notes that that even if Northam, Clarke, or Woodson in fact committed an Eighth Amendment violation, they are entitled to qualified immunity as to all claims for damages against them in their individual capacities.  The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  The burden of proof is on the party seeking immunity. *Wilson v. Prince George's Cnty., Md.*, 893 F.3d 213, 219

(4th Cir. 2018).

In determining whether an official is entitled to qualified immunity, courts engage in a two-pronged inquiry. *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). The first prong asks whether the facts, taken in the light most favorable to the party asserting the injury, show the defendant's conduct violated a constitutional right. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second prong asks whether the right was "clearly established" at the time of the defendant's conduct. *Id.* If the answer to either prong is "no," the official is entitled to qualified immunity.

As applied here, it would not have been apparent to any of the defendants that their alleged conduct would violate Zellers's clearly established constitutional rights. The COVID-19 pandemic was a new and unusual issue, and there was ongoing and changing guidance from health officials at both the state and federal levels as to the best way to manage the crisis. VDOC and BKCC apparently implemented protocols and policies and procedures to deal with the pandemic, which was a difficult situation for the whole of society and every business, but especially for congregate settings like prisons. Even if some of these policies were insufficient, neither the policies nor occasional lapses in following them were clearly insufficient to protect prisoners, given the novelty of the virus and the questions—and evolving guidance—as to how to prevent its spread and treat it. *See Ross*, 2022 WL 767093, at *14 (holding that defendants named in similar claims were entitled to qualified immunity); *Ryan*, 2021 WL 6750962, at *9 (finding defendant jail officials were entitled to qualified immunity on similar claims and explaining that "[t]he world's understanding of COVID-19 is constantly evolving, and there is no precedent that would have made it clear to a reasonable official that the measures Defendants took unreasonably responded to the COVID-19 pandemic"); *see also Tate v. Arkansas Dep't of Corr.*, No. 4:20-cv-558, 2020 WL 7378805, at *11 (E.D. Ark. Nov. 9, 2020) (granting qualified

immunity to jail officials who took precautionary measures in response to the pandemic because, even if they were inadequate, they were not clearly so; and reasoning that "COVID-19 is, by definition, a 'novel' coronavirus" which has posed challenges "unlike any other in the modern era," so a reasonable prison official would not have known that if defendants' response violated the plaintiff's clearly established rights), *report and recommendation adopted by* No. 4:20-cv-558, 2020 WL 7367864 (E.D. Ark. Dec. 15, 2020).  Accordingly, the court concludes that, as to any claims against them in their individual capacities, defendants Northam, Clarke, and Woodson are entitled to qualified immunity.

**B.  Defendant L. Woodson's Motion to Dismiss**

The court turns next to defendant L. Woodson's motion to dismiss, which seeks dismissal of the sole claim against her.  That § 1983 claim alleges that L. Woodson violated Zellers's Eighth Amendment rights by failing to obtain prompt medical attention for him when he complained of his breathing difficulty on June 4, 2020.

**1.  Legal standard**

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 677–80 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–63 (2007); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).  To withstand a Rule 12(b)(6) motion, a pleading must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.  In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to the nonmoving party." *Massey v. Ojaniit*, 759 F.3d 343, 347 (4th Cir. 2014).  A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano*, 521 F.3d at 302.  *Pro se* complaints are given a liberal construction.  *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006).

**2.  Eighth Amendment claim – deliberate indifference to a serious medical need**

Zellers's claim against L. Woodson alleges a violation of the Eighth Amendment, asserting that she was deliberately indifferent to his COVID-19 symptoms.  "[A] prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment."  *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019).  To demonstrate deliberate indifference, an inmate must show that (1) he has a medical condition that has been "diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" and (2) the defendant "had actual knowledge of the plaintiff's serious medical needs and the related risks, but nevertheless disregarded them."  *Id.* at 356–57; *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). The first component is an objective inquiry and the second is subjective.  *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017).

To establish deliberate indifference, a plaintiff must present facts to demonstrate that the defendant had actual knowledge of an objectively serious medical need and disregarded that need.  *Farmer*, 511 U.S. at 837; *see also Rish v. Johnson*, 131 F.3d 1092, 1096 (4th Cir. 1997). To qualify as deliberate indifference, the defendant's conduct must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

Most importantly, Zellers does not plausibly allege that L. Woodson was deliberately indifferent to his request for medical care.  She told him that there was no one in the medical department, but by 8:00 a.m. on the same day he first complained, she had cleared him to go to the medical department and sent him there.  This does not constitute deliberate indifference. Zellers seems to believe that he should have been immediately taken to medical the moment he

complained.  But the symptoms as he described to L. Woodson were that he was having "shortness of breath," among other symptoms.  If an inmate was not breathing at all and the prison officer knew that, a delay of hours obviously would constitute deliberate indifference. Moreover, there are other situations where a delay of several hours in getting treatment could constitute deliberate indifference (where, for example, a person was suffering from a gunshot wound or significant bleeding from a knife wound).  But Zellers obviously was breathing, as he was well enough to speak, and was even able to walk to the medical department on his own, although he claims it was with difficulty.  In sum, the brief delay of several hours here, on the facts alleged by Zellers, does not constitute deliberate indifference by L. Woodson.

Additionally, as L. Woodson notes in her motion, an Eighth Amendment deliberate indifference claim based on a delay in medical treatment requires the plaintiff to show that the delay caused him to suffer "substantial harm."  *Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir. 2008).  *See also Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (explaining that where a claim is based not on a denial of medical care, but a claim that the care has been delayed, "we have ruled that there is no Eighth Amendment violation unless the delay 'results in some substantial harm to the patient,' such as a 'marked' exacerbation of the prisoner's medical condition or 'frequent complaints of severe pain'") (*citing Webb*, 281 F. App'x at 166–67, and *Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732, 734 (4th Cir. 2015)).  The *Formica* court recognized that *Webb* and *Sharpe* were both unpublished decisions but noted that they are nonetheless "consistent ... with the precedent of other courts of appeals."  *Formica*, 739 F. App'x at 755 (citations omitted).  Zellers has not alleged that the hours-long delay in treatment cased a "marked" exacerbation of his condition.  *See Formica*, 739 F. App'x at 755.

For all of these reasons, Zellers's his claim against L. Woodson fails as a matter of law.

24

III.  CONCLUSION

For the foregoing reasons, the court will grant both motions.  In light of the dismissal  of the case, all remaining motions will be denied as moot.  An appropriate order will be entered.

Entered: August 29, 2022.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge